**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 21-CR-1034-CJW-MAR |
| vs. | | **ORDER** |
| LORENZO DEVON LEMONS, SR., | | |
| Defendant. | | |

_____

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................ 2

II.  STANDARD OF REVIEW.............................................................. 2

III. FACTUAL BACKGROUND ........................................................... 5

IV.  ANALYSIS...................................................................................13

V.   CONCLUSION .............................................................................26

1

# I.    INTRODUCTION

This matter is before the Court on defendant's objections (Doc. 38) to the Report and Recommendation ("R&R") of the Honorable Mark A. Roberts, United States Magistrate Judge, recommending that the Court deny defendant's Motion to Suppress Evidence. (Doc. 36).

On December 22, 2021, defendant filed a Motion to Suppress. (Doc. 18). The government timely resisted the motion. (Doc. 21). Defendant filed a response. (Doc. 35). On January 25, 2022, Judge Roberts held a hearing on the motion (Doc. 30) and on February 17, 2022, he issued his R&R, recommending that the Court deny defendant's motion (Doc. 36). On March 3, 2022, defendant timely filed his objections to the R&R. (Doc. 38).

For the following reasons, the Court **overrules** defendant's objections Nos. 2–6 and 8–20, **sustains** objections Nos. 1 and 7, **adopts** Judge Roberts' R&R with minor modification, and **denies** defendant's Motion to Suppress.

# II.    STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude

> further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district courts required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity of . . . retention by the district court of substantial control

over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full *de novo* review" if the record is concise. *Id.* Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation

when the district court "is left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: A district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III.    FACTUAL BACKGROUND

Based on the evidence submitted at the suppression hearing, Judge Roberts made extensive factual findings. Defendant states that he objects to various factual findings, (Doc. 38, at 1-13), but the Court finds that defendant's objections to factual findings are largely objections to legal conclusions Judge Roberts drew from particular factual findings. The Court will address each objection below in the analysis section.

After reviewing the record—including the parties' arguments, exhibits, and the video evidence—the Court **overrules** defendant's objections Nos. 2–6 and 8–20 and **sustains** Nos. 1 and 7. On review, the Court finds that Judge Roberts thoroughly and

5

accurately summarized the relevant facts in his R&R, with one minor exception as it relates to defendant's objection No. 7. The Court adopts and incorporates the R&R's factual findings with minor modification.

The following facts are gleaned from the hearing testimony and the exhibits admitted into evidence.

Shortly after beginning their shift at 11:00 p.m. on September 12, 2021, DPD Patrol Officers Benjamin Goerdt and Calvin Harridge were assigned to conduct surveillance for a suspect named Christopher Williams near xx71 Bluff Street, apartment 3 in Dubuque. Officer Harridge drove an unmarked police vehicle to the area of xx71 Bluff Street to begin surveillance at approximately 12:30 a.m. Although the car was unmarked, both officers were in uniform and the car did not have tinted windows.

Prior to beginning surveillance, the officers read a report that provided them with the following information: On September 11, 2021, Christopher D. Williams, who was wanted on an arrest warrant in Illinois, was involved in a high-speed pursuit with police officers in East Dubuque, Illinois that ended when Mr. Williams crashed his vehicle. (Gov. Ex. 1 at 1; Goerdt Hr'g Test. at 17). At the time the pursuit was initiated, the East Dubuque Police Department ("EDPD") had received "multiple intels" that Mr. Williams frequently trafficked firearms and drugs from Chicago to Dubuque. (Gov. Ex. 1 at 1). Mr. Williams had extraditable weapons and eluding warrants from Illinois. (*Id.*). Mr. Williams was considered armed and dangerous and knew he had open arrest warrants. (*Id.*). EDPD officers found "multiple rifles and handguns" in the vehicle. (*Id.*). Mr. Williams was transported to Mercy Hospital for treatment. (*Id.*). Mr. Williams escaped from the hospital in a tan 2015 Ford Focus registered to his girlfriend, S.H. (*Id.*). S.H., in turn, was associated with xx71 Bluff Street, Dubuque, Iowa, apartment 3 (alternatively, "the residence" or "xx71 Bluff Street"). There was not any information specifically tying apartment 3 to the trafficking of firearms.

Officer Goerdt also sought information about Mr. Williams on DPD's in-house "RMS system" which contains information about "subjects that have been arrested, contacts, etcetera." (Goerdt Hr'g Test. at 10-11). When someone is arrested or has contact with the DPD, "their name comes up," and their information can be edited in the system: "names, [birth dates,] heights, weights, things like that can be changed by the officers." (*Id.* at 11). Information is input by officers based on what suspects,

witnesses, or victims tell officers. There is no formal method for verifying information such as height and weight. (*Id.* at 11-12). Any officer can edit information in the system and dispatchers also have limited access to the system. (*Id.* at 11). Information in the system is sometimes inaccurate because people change appearance over time by changing hair color, gaining or losing weight, or growing taller. (*Id.* at 13). Information can also be inaccurate due to typographical errors or because an officer was given inaccurate information. (*Id.* at 14).

Officer Goerdt found information about Mr. Williams in the RMS system. The photograph on the right side of Defense Exhibit B is the photograph Officer Goerdt found. Information also included Mr. Williams's height, weight, and date of birth. The photograph of Mr. Williams shows a Black man with neatly cut hair, wide-set dark eyes, a scant mustache, and a full black beard growing under his chin from ear to ear. (Def. Ex. B). Officers would later call this beard a "wrap-around beard." The officers described Mr. Williams as "a larger black male, approximately 6'-0" tall, approximately 200 pounds . . . [with] a dark beard that wraps around his face." (Def. Ex. D). Officers did not inquire as to when the photograph of Mr. Williams was taken to confirm that he still looked similar to that photograph. (Goerdt Hr'g Test. at 70). Officer Goerdt could not recall if Mr. Williams's height was listed in the arrest warrant. (*Id.* at 73). Neither officer had any prior knowledge about Mr. Williams.

Officers Goerdt and Harridge were told that officers watching traffic cameras in the area had seen S.H.'s Ford Focus "coming and going from the residence throughout the day," although there was no sign of Mr. Williams. (*Id.* at 9). Government's Exhibit 2, a photograph of xx71 Bluff Street, shows a three-story apartment building. S.H.'s apartment is located on the second floor (i.e., the middle floor) on the right side and is accessible via one of two doors on an outdoor second-floor landing, which the parties call "the porch." The porch can be reached by two stairways from the sidewalk, one on the right and one on the left. (Gov. Ex. 2.) The right-side door of the porch leads into an interior common area. (Debban Hr'g Test. at 159-60, 172; Def. Ex. E at 8, 9 (photos showing porch door to xx71 open and lights on in apartment 3)). Immediately inside and to the right in that common area is the door to apartment 3. There is a small public green space across the street from xx71 Bluff Street called Grant Park. (Gov. Ex. 8 (aerial photo of the neighborhood)).

The area was lit by streetlights located in the median across the street from the residence. (Gov. Ex. 9, 10, 11; Car Cam. at 1:46:00-1:52:44; Pape Body Cam. at 1:50:46-1:51:26 (showing position of streetlights in relation to the residence); Def. Ex. F at 1 (photo taken Jan. 18, 2022)). Officer Goerdt testified that it was dark during surveillance and that he and Officer Harridge could not see on top of the porch very well because the streetlight lit the roadway, not the porch. (Goerdt Hr'g Test. at 20; Harridge Hr'g Test. at 111; Gov. Ex. 7 (screen shot of inside of Officer Harridge's patrol car showing street light on left and dark porch of xx71 Bluff Street on right through dashboard window)). Officers Goerdt and Harridge specifically stated it was darker than shown in the photographs in Defendant's Exhibit E at 8, 9, 10, and 20. (Goerdt Hr'g Test. at 20; Harridge Hr'g Test. at 112).

Officer Harridge parked the unmarked car he and Officer Goerdt were assigned to "just up from [xx71 Bluff Street] on 16th Street on the corner, [where they] had a visual across the street towards the [residence]" and were about half a block away from the residence. (Goerdt Hr'g Test. at 16, 18 (stating they were parked behind where the black car is parked in Gov. Ex. 11), 19 (testifying they were approximately half a block away); Gov. Ex. 8 (aerial photo showing positions of unmarked police car and xx71 Bluff Street); Gov. Ex. 11 (showing view officers had of xx71 Bluff Street)). Officers used binoculars during surveillance. (Goerdt Hr'g Test. at 53). Officers chose that location because they could properly surveille the residence without alerting Mr. Williams to their presence. Mr. Williams was considered armed and dangerous because he had led officers on a highspeed chase and escaped custody at the hospital. The officers' plan was to detain Mr. Williams if they saw him and probably handcuff him due to reports that he had guns. (*Id.* at 96; Harridge Hr'g Test. at 148.) Cars were parked "bumper to bumper" in front 7 of the residence when the officers began surveillance. (Harridge Hr'g Test. at 143). S.H.'s Ford Focus was not one of the cars parked on the street; Officers Goerdt and Harridge did not see the Focus during surveillance of the residence.

When the officers began surveillance at approximately 12:30 a.m. on September 13, they saw three men on the porch of xx71 Bluff Street going up and down the stairs to xx51 Bluff Street, a very similar apartment building next door to xx71 Bluff Street (i.e., on the left in photographs). (Gov. Ex. 2; Harridge Hr'g Test. at 108-09). Officer Goerdt thought one of the subjects looked like Mr. Williams based on his build, "wraparound beard," "more round face," full head of hair without a receding hairline,

8

and Officer Goerdt's impression that the subject was acting as if he did not want to be noticed. (Goerdt Hr'g Test. at 19). Although Officer Harridge admitted that he could not see under the subject's chin very well, he thought the subject had a black beard that "wrapped around under his chin." (Harridge Hr'g Test. at 109). The subject was moving around, not standing still. At approximately 12:47:56 a.m., a marked squad car drove past the residence. At that time, the subject Officers Goerdt and Harridge believed to be Mr. Williams ("Defendant") was on the porch of the residence and the lights were on in apartment 3. When the squad car drove by, Defendant went into the apartment and the lights went off. Officer Harridge saw his "shadow go into" the apartment because the light backlit him. (*Id.* at 113). No one else went into the apartment. (Goerdt Hr'g Test. at 77). Officer Goerdt thought that Defendant was trying to hide from law enforcement because he went into apartment 3 and turned the lights off as soon as law enforcement drove by. (*Id.* at 22; Harridge Hr'g Test. at 113-14). After the squad car left the area, Defendant came back onto the porch, descended the stairs, met two other males on the sidewalk, talked and "hung out" in the sidewalk area between xx71 and xx51 Bluff. Street, went up the stairs to the porch of xx51 Bluff Street, hung out there, and came back down to the sidewalk. (Goerdt Hr'g Test. at 22-23; Harridge Hr'g Test. at 114-15). During surveillance, other people and the parked vehicles sometimes obstructed the officers' view of Defendant because the group of people was moving during this time. (Goerdt Hr'g Test. at 22-23, 93; Harridge Hr'g Test. at 114-15). In addition, because there were several different pavement heights in the area (i.e., the curb, the various steps, the sidewalk, and other changes in elevation), it was difficult for officers to judge Defendant's height in comparison to the height of the other men in the group from their vantage point, especially with vehicles blocking the view. (Harridge Hr'g Test. at 116-17, 143-44 (questioning about Gov. Ex. 2, which shows various pavement heights at xx71 Bluff Street and between xx71 Bluff Street and xx51 Bluff Street)).

After continuing their surveillance for some time, Officer Harridge decided to drive past the group to get a better look at Defendant. Officer Harridge drove past the residence at approximately 1:48 a.m. and Officer Harridge thought the group of people outside the residence was "hypervigilant." (*Id.* at 117). Officer Harridge testified that the group was "staring . . . down" the officers' vehicle as it drove by. (*Id.*). Officer Harridge saw Defendant "peek[ ] his head" over a parked van, but Officer Goerdt only saw Defendant look backwards over his shoulder over the top

of the van at the officers as they drove by. (Goerdt Hr'g Test. at 27; Harridge Hr'g Test. at 117). Although Officer Goerdt was unable to get a good look at Defendant, he thought that Defendant looking backwards over his shoulder over the van after the officers drove by was suspicious. (Goerdt Hr'g Test. at 27). [Officer Harridge testified that he was able to identify defendant as Mr. Williams, and Officer Goerdt testified that Officer Harridge was able to identify defendant as Mr. Williams. (Harridge Hr'g Test. at 140-41; Goerdt Hr'g Test. at 73).][1] Likewise, Officer Harridge thought that Defendant's action of looking over the top of a van to view people driving by was a hypervigilant action consistent with someone who is "watching their back for some reason." (Harridge Hr'g Test. at 118). Officers never saw Defendant with a firearm, saw Defendant make any movements consistent with firearms possession, or noticed any bulges in Defendant's clothing that were consistent with carrying a firearm. (Goerdt Hr'g Test. at 39-40). Officers Harridge and Goerdt had the following exchange after they drove past the residence.

| Officer Goerdt: | That him? |
|---|---|
| Officer Harridge: | I think so. |
| Officer Goerdt: | That was it? |
| Officer Harridge: | I think so. |
| Officer Goerdt: | Are you sure? |
| Officer Harridge: | Pretty sure. |
| Officer Goerdt: | Just keep going straight. I don't know if it was him. Did you get a good look at him? I tried to duck behind the pillar [inaudible]— |
| Officer Harridge: | I'm pretty sure. |
| Officer Goerdt: | Do you want me to jump out on him? |
| Officer Harridge: | Let's drive around the block. |
| Officer Goerdt: | Just get out of view. Do you think he seen me? |
| Officer Harridge: | Man, I – Fuck. |
| Officer Goerdt: | I couldn't tell. 'Cause his head was—I could just see his head was ducked under that— |
| Officer Harridge: | Behind the car— |
| Officer Goerdt: | I couldn't tell— Officer Harridge: He had his chin up, though. |

---

[1] The Court sustains defendant's objection seven, which it explains below in the analysis section. Accordingly, the Court adds the following to the factual findings here.

| Officer Goerdt: | I seen that little bit of a beard, too. |
| Officer Harridge: | He was up like this [sounds of gesturing and unclear video of some kind of gesture]. |
| Officer Goerdt: | Do you think it was too dark? |
| Officer Harridge: | I don't think so. |
| Officer Goerdt: | I think it was him, too [looking at Mr. Williams's photo on tablet]. |

[Approximately a minute elapses during which the officers discuss their strategy for approaching Mr. Williams. Then the following exchange takes place between the officers.]

| Officer Goerdt: | . . . if you believe it's him. I can't, I couldn't see a good mug— |
| Officer Harridge: | I think it's him. He had the chin. He got the body style. |

(Harridge Body Cam. at 1:44:59-1:46:55). Thus, Officer Harridge, who had a better view than Officer Goerdt, thought Defendant was Mr. Williams. (Goerdt Hr'g Test. at 27-28).

Defendant is 5'-3" tall. While Defendant is a Black male with facial hair, on September 13, 2021, his hair was a bit longer than Mr. Williams's hair, although not much, and Defendant had a goatee, not a "wrap-around" beard. (Def. Ex. B; Pape Body Cam. at 2:17:51). Defendant and Mr. Williams appear to be about the same age. (Def. Ex. B). Defendant's eyes are not as wide set as Mr. Williams's eyes and have a more round shape than Mr. Williams's eyes. (*Id.*) In Defendant's Exhibit B, Defendant's complexion appears darker than Mr. Williams's complexion. (*Id.*). Officers Goerdt and Harridge did not pay attention to the other two males with Defendant once they determined that Defendant was a Black male acting as if he did not want to be noticed who had "a stockier build," a wrap-around beard," and "a more round face." (Goerdt Hr'g Test. at 19, 72).

Once the officers decided Defendant was Mr. Williams, they made their approach. Officer Harridge activated the emergency lights just north of the group and as soon as Officer Goerdt exited the car, Defendant began running. (Goerdt Body Cam. at 1:50:08-10; Goerdt Hr'g Test. at 28). Officers found Defendant's immediate flight suspicious because running is consistent with behavior of an escaped fugitive. (Goerdt Hr'g Test. at 29;

Harridge Hr'g Test. at 119). Officer Goerdt ran after Defendant, thinking he was Mr. Williams, and yelled, "Chris, get on the Ground," and repeated "get on the ground, get on the ground," while pulling his duty weapon and chasing Defendant across the street into Grant Park. (Goerdt Body Cam. at 1:50:09-16.) Defendant got on his stomach on the ground and said, "I ain't no Chris! I ain't Chris. My name's Lorenzo." (*Id.* at 1:50:11-20). By this time, Officer Harridge had his knee in Defendant's back and was attempting to grab Defendant's hands, which he was holding over his head, and handcuff them behind his back. Defendant had locked his hands into fists and refused to put his hands behind his back. (Goerdt Hr'g Test. at 32; Harridge Body Cam. at 1:50:21-46). Defendant refused to relax his hands as directed and his body position—pushing his waist into the ground—indicated to Officer Goerdt that Defendant may be hiding a weapon near his "beltline." (Goerdt Hr'g Test. at 32). Defendant continued to insist he was not Chris. Although Officer Goerdt had previously encountered Defendant, he did not recognize him at this point. (*Id.* at 33).

While Officers Goerdt and Harridge were dealing with Defendant, a bystander who had been hanging out with Defendant approached Officer Pape, who had arrived on the scene shortly after Officers Goerdt and Harridge exited their vehicle. (Pape Hr'g Test. at 150-51). The bystander told Officer Pape that Defendant was not Chris, but was named Lorenzo; that Defendant had the bystander's legally-registered gun on him; and that he wanted permission to go into his car to get the registration. (Pape Body Cam. at 1:50:57-1:51:30). Officer Pape told the bystander to stand back and then turned to Defendant, who was still on his stomach, and pulled a Springfield 9mm handgun from the front of Defendant's waistband. (*Id.* at 1:51:43-49; Pape Hr'g Test. at 152). After the gun was seized, Defendant continued to refuse to be handcuffed. Officers finally handcuffed Defendant and got him to his feet at 1:54:28 a.m. At that point, officers determined Defendant was not Mr. Williams because he had a different beard. (Goerdt Hr'g Test. at 96). Although Officer Harridge could tell that Defendant was only 5'-3" tall, Officer Goerdt could not tell at that time that Defendant was only 5-3" tall. (*Id.* at 97, 135). Defendant was arrested and charged with interference with official acts. (Def. Ex. D).

(Doc. 36, 2-11) (footnotes omitted).

# IV. ANALYSIS

Defendant makes twenty objections.  The Court will address each in turn.

In objection one, defendant objects to Judge Roberts' finding that there is no formal method for verifying information such as height and weight.  (Doc. 38 at 1). Defendant offers testimony stating that "the officer had the opportunity to see the person's height, right?"  (Doc. 38, at 2 (citing Doc. 31-1, at 50-51)).  The Court does not find that just because the officer may have had the opportunity to view defendant's height that this proves Judge Roberts incorrectly found that there is no formal method for verifying height.  It is true that officers inputting information into the RMS system are also likely in a position to observe the subject they are reporting on, assuming they are not taking a description from a third-party witness.  In such a position, they are not likely to blindly transcribe the description of a subject before them that plainly does not match what they are being told.  Thus, to the extent that it provides some additional context, defendant is correct that officers may also rely on their observations when creating entries in the RMS system.  This additional context does not contradict Judge Roberts' conclusion that there is no formal method for verifying the information, however.  Nothing in the record indicates that officers are regularly equipped with objective fiducial instruments or that there is a standard practice of taking subjects back to the station to be weighed and measured.  Except in cases of extreme disparity between an officer's logical inference about a person's height and that person's self-reported height, an officer's ability to fact check a subject is extremely limited.  The Court sustains defendant's objection on this ground only to the extent that it provides additional, albeit limited, context.

In objection two, defendant objects to Judge Roberts' finding that "information in the system is sometimes inaccurate because people change appearance over time by changing hair color, gaining or losing weight, or growing taller."  (Doc. 38, at 2 (citing Doc. 36, at 4)).  Defendant argues that defendants cannot become shorter, as pertinent

Case 2:21-cr-01034-CJW-MAR   Document 47   Filed 04/07/22   Page 13 of 26

to this case.  (Doc. 38, at 2).  The Court finds that defendant took Judge Roberts' statement out of context, as he was not directly stating nor implying that defendant may have become shorter.  Rather than asserting that the suspect may have become shorter as support for a denial of defendant's motion, as defendant claims, the Court finds that Judge Roberts was merely providing background as to how information in the system may be inaccurate.  The Court overrules defendant's objection on this ground.

In objection three, defendant objects to the R&R's statement that "Officer Goerdt testified that it was dark during surveillance and that he and Officer Harridge could not see on top of the porch very well because the streetlight lit the roadway, not the porch." (Doc. 38, at 2 (citing Doc. 36, at 6)). Defendant argues that this characterization is incomplete and points the Court to the rest of the testimony.  (Doc. 38, at 2).  However, the testimony defendant offers is not Officer Goerdt's testimony, which the R&R refers to, but rather Officer Harridge's testimony.  Officer Goerdt did in fact testify that it was dark during their surveillance which made it difficult for him and Officer Harridge to see on top of the porch.  (Doc. 31-1, at 1).  Here, Judge Roberts was not making a factual finding about the amount of light on the porch, he was merely stating Officer Goerdt's perception as testified to at the suppression hearing.   Thus, the Court overrules defendant's objection on this ground.

In objection four, defendant objects to Judge Roberts' finding that law enforcement thought defendant was Williams because defendant had a wrap-around beard.  (Doc. 38, at 3).  Defendant argues that Officer Goerdt testified that defendant did not have a wrap-around beard.  (*Id.*).  The Court agrees with defendant that Officer Goerdt did testify that defendant did not have a wrap-around beard, but that testimony was offered after defense counsel showed Officer Goerdt body camera footage of defendant.  (Doc. 31-1, at 57). Earlier in the hearing, Officer Goerdt testified that when they were conducting surveillance, defendant appeared to have a wrap-around beard when standing on the

porch.  (*Id.* at 19).  The Court sees a distinction between the officer viewing body camera footage of defendant on the street where there was more lighting, and the officer viewing defendant from a distance when he is standing on a relatively dark porch.  The objection here is to the portion of the R&R which specifically describes what the officers observed while conducting surveillance from across the street, not what they learned or observed later.  It is unreasonable to use information that officers obtained later to object to a recitation of their subjective perceptions in the moment.  Although defendant may not actually have a wrap-around beard, it is understandable that defendant may have appeared to have such beard when the officers were surveilling him from a distance.  The Court overrules defendant's objection on this ground.

In objection five, defendant objects to the R&R's statements that "other people and the parked vehicles sometime obstructed the officers' view of Defendant because the group of people was moving during this time."  (Doc. 38, at 3 (citing Doc. 36, at 8)).  Specifically, defendant objects to this factual statement as incomplete, adding that "both officers testified that they were sufficiently able to observe the Defendant on the sidewalk to permit his (mistaken) identification as Williams."  (Doc. 38, at 3).  The Court construes defendant's argument to mean that the officers' obstructed view should not matter if they were later able to identify defendant as Williams.  The Court rejects defendant's argument.  As Judge Roberts noted in the R&R, the officers' vantage point changed during surveillance, specifically from the time they noted that people and vehicles were sometimes obstructing their view to the time they decided to drive past the sidewalk to get a better view of defendant.  (Doc. 36, at 8).  Officer Harridge specifically testified that the "combination of the distance and the lighting conditions" allowed the officers to be able to identify defendant as Williams.  (Doc. 31-1, at 140).  The Court recognizes that a change in vantage point and a change in conditions may have allowed officers to see defendant more clearly.  Further, Judge Roberts found the officers' view

was *sometimes* obstructed, not obstructed in general. Judge Roberts' recitation of the facts included both the fact that the officers' view was impeded at times and that they were able to observe defendant closely for identification at other times. These facts may not be relayed in the manner most semantically suitable to defendant, but that does not warrant an objection. The Court does not find that the R&R's statement of the obstructed view is incorrect, or even incomplete, as that was in fact the conditions of the officers' viewpoint from that specific vantage point during their surveillance. The Court overrules defendant's objection on this ground.

In objection six, defendant argues that the R&R was incomplete when it stated that "it was difficult for the officers to judge Defendant's height in comparison to the height of the other men in the group from their vantage point, especially with vehicle blocking their view." (Doc. 38, at 4 (citing Doc. 36, at 8)). Defendant offers testimony to support its argument. *See* (Doc. 38, 4-7). The Court does not find that the officers' testimony offered by defendant sufficiently supports defendant's claim that the R&R was incomplete on this point. The Court finds that the statement proffered by defendant is in fact incomplete, because the R&R prefaces the statement by also saying that "there were several different pavement heights in the area (i.e., the curb, the various steps, the sidewalk, and other changes in elevation)." (Doc. 36, at 8). The officers' testimony offered by defendant in objection six supports the R&R's factual finding, in that Officer Goerdt stated "[s]ometimes you can't tell [heights]. There were different levels of the sidewalk." (Doc. 38, at 5 (citing Doc. 31-1, at 62)). For these reasons, the Court finds that the R&R was not incomplete on this factual finding and overrules defendant's objection on this ground.

In objection seven, defendant argues that the R&R's factual finding that Officer Goerdt was unable to get a good look at defendant is incomplete. (Doc. 38, at 7-8). Defendant offers Officer Harridge's testimony that he was able to identify defendant as

Case 2:21-cr-01034-CJW-MAR   Document 47   Filed 04/07/22   Page 16 of 26

Williams and adds that Officer Goerdt testified that Officer Harridge was able to identify defendant as Williams. (*Id.*). The Court finds that Judge Roberts' factual finding on this point could use more context, and as such defendant's objection on this ground is sustained and the facts as recited above were modified accordingly.

In objection eight, defendant objects to the R&R's statement that the officers determined, based on the different beard, defendant was not Williams after they hand-cuffed him and defendant stood. (*Id.*, at 8). Defendant asserts that the evidence makes clear that the officers should have known before this point that defendant was not Williams. (*Id.*). Defendant asserts that the officers "should have known the Defendant was not Williams" while they were conducting surveillance or, at the latest, when they first observed him lying on the ground. The Court construes defendant's argument as hinging on a lack of reasonableness for the officers' actions. As Judge Roberts noted in the R&R, and the Court reiterates, the officers need only to have reasonable suspicion that defendant was Williams to stop him. *United States v. Williams*, 929 F.3d 539, 544 (8th 2019); (Doc. 36, at 16). As Judge Roberts points out, the officers did not ignore a clearly distinguishable piece of information about defendant's appearance. (Doc. 36, at 17). Although defendant is shorter than Williams, it is not unreasonable that the officers would not have immediately noticed defendant's height difference, particularly given the other factors and circumstances present during the officers' surveillance: officers' distance from defendant, varying elevation, poor lighting, and a lack of objective point of reference. The Court agrees with Judge Roberts that there were enough objective facts that, taken together with reasonable inferences and the circumstances of the surveillance, would have reasonably led the officers to mistaking defendant for Williams: "(a) Defendant had access to the apartment where Mr. Williams's girlfriend lived; (b) Defendant appeared to be avoiding law enforcement; and (c) Defendant was a Black

man with a stocky build, a full head of hair, and a beard." (Doc. 36, at 17). The Court overrules defendant's objection on this ground.

In objection nine, defendant asserts that the R&R failed to state that the "[d]efendant and Williams look nothing alike," and objects to anything in the R&R that suggests the contrary or fails to acknowledge the disparity in appearance. (Doc. 38, at 8). Defendant reaches too far on this objection. Defendant does not point the Court to any specific text in the R&R that it objects to on this ground. In fact, defendant acknowledges that Judge Roberts described defendant and Williams as "readily distinguishable," but asserts that this description is insufficiently fervent to do justice to the difference. (*Id.*, at 8 n.2). The Court reiterates that a semantic disagreement with the R&R does not warrant an objection. Judge Roberts did acknowledge the physical differences between defendant and Williams, albeit not as vehemently as defendant may prefer. Further, the claim that defendant and Williams look nothing alike is a stretch, which only reinforces as appropriate the more muted tone struck by Judge Roberts. As Judge Roberts noted in the R&R and the Court has already recognized, both defendant and Williams are black men with a stocky build, a full head of hair, and facial hair. (Doc. 36, at 17). The Court overrules defendant's objection on this ground.

In objection ten, defendant asserts that the "R&R excuses law enforcement's inability to distinguish a 6 foot tall man from a 5 foot 3 inch tall man." (Doc. 38, at 9). The Court construes defendant's objection as a claim that the officers did not have reasonable suspicion to stop defendant or that their suspicion was objectively unreasonable. The Court has already addressed reasonable suspicion in its response to objection eight, finding that there were enough objective facts that taken together with reasonable inferences and the factors present during surveillance would have reasonably led the officers to mistaking defendant for Williams. The Court overrules defendant's objection on this ground.

18

Objection eleven is not so much an objection as it is a somewhat snide comment on Judge Roberts' conclusion. As such, it warrants no respect or response from the Court.

Objections twelve and thirteen regard the reasonableness of the officers mistaking defendant for Williams. *See* (*Id.* at 11). The Court has already found that the officers' stop of defendant was sufficiently supported by reasonable suspicion. The Court overrules defendant's objections on this ground.

In objection fourteen, defendant objects to the R&R's finding that defendant's access to Williams' girlfriend's apartment demonstrates the reasonableness of the officers mistaking defendant for Williams. (*Id.* at 11). Defendant asserts that "[a]ccess to the apartment is only important in a superficial vacuum" because, as defendant argues, his behavior was not consistent with that of a fugitive. (*Id.*). The Court disagrees that defendant's access to the apartment is only important in a vacuum. As Judge Roberts and the Court already noted in response to objection eight, there were other factors and circumstances that, when combined with defendant's access to the apartment, provided the officers with reasonable suspicion that defendant could be Williams. The Court overrules defendant's objection on this ground.

In objection fifteen, defendant asserts that the R&R incorrectly disagreed with defendant's argument that the mistake made by officers was "inexplicable and indefensible" because the "mistake occur[ed] under circumstances which law enforcement believed to be sufficient to make a correct identification." (Doc. 34, at 8-9; Doc. 38, at 11). Again, as the Court has already noted, and consistent with Judge Roberts' analysis on this objection, the objective facts combined with the circumstances and factors of the surveillance could lead the officers to have a reasonable suspicion that defendant was Williams. The reasonable suspicion analysis contains no requirement of infallibility, and perceptions that may be eminently apparent to defense counsel upon

measured review and with the benefit of hindsight do not control the Court's consideration of what officers reasonably believed at the time. Officers Goerdt and Harridge believed that they observed enough detail to at least warrant further investigation. It must be noted that at the point when defendant began his headlong flight from the police, no seizure had yet occurred. Defendant had not been detained or arrested. The officers did not yet even have the opportunity to attempt questioning, let alone get close enough to compare defendant's height to their own. Defendant's continued insistence that the officers should have been able to ascertain defendant's height in a vacuum without the aid of any reference is simply unreasonable. *United States v. Lopez-Tubac*, No. CR18-3020-LTS, 2018 WL 3995950, at *4 (N.D. Iowa Aug. 21, 2018) ("Variances in height and weight are difficult to measure through observation alone without a point of reference."); *see also United States v. Phillips*, 679 F.3d 995 (8th Cir. 2012) (finding officers' mistake reasonable where suspect and defendant shared some of the same characteristics, despite not sharing others).

Defendant also takes issue with Judge Roberts' use of *United States v. Gilliam* to support his finding that because of "the fluidity of the situation and the totality of the circumstances, the difference in height did not eliminate reasonable suspicion." (Doc. 36, at 19). Defendant asserts that unlike in *Gilliam*, the officers in this case faced a less volatile situation. (Doc. 38, at 12). The Court finds that Judge Roberts appropriately used *Gilliam* to support his finding. In *Gilliam*, officers actually had a better opportunity to view the suspect's height than officers did in the present case. Officers there were in an apartment with and close in proximity to the suspect, rather than surveilling from a distance on a dimly lit street at night. *United States v. Gilliam*, 520 F.3d 844, 846 (8th Cir. 2008). As such, the Court rejects defendant's argument, and finds that, like in *Gilliam*, there were enough objective facts that when combined with the other factors and circumstances, as already discussed earlier, that would allow officers to have a reasonable

suspicion that defendant was Williams, despite the height difference. *Id.* at 846–48. The Court overrules defendant's objection on this ground.

In objection sixteen, defendant argues that defendant's flight should not have been factored in to Judge Roberts' analysis because the officers should have known before defendant's flight that he was not Williams. (Doc. 38, at 12). As the Court has already noted, the officers' belief that defendant may be Williams was sufficiently reasonable for the officers to further their investigation by approaching the person they believed to be Williams. When, at that point, that person fled, it further supported their reasonable suspicion that the person was Williams who had a motive to flee because there was a warrant for his arrest. Further, as noted above, the seizure did not occur until after defendant laid on the ground and submitted to police authority. Everything that occurred to that point may be considered in the formation of reasonable suspicion.

The Supreme Court and the Eighth Circuit have held that unprovoked flight may create a reasonable suspicion in a police officer that criminal activity is afoot and will justify the stop of the suspect. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that unprovoked flight is an act of evasion that is a relevant factor in determining reasonable suspicion); *see also United States v. Benson*, 686 F.3d 498, 502 (8th Cir. 2012) (holding that when police officers ordered a suspect to stop, the suspect's decision to increase his speed and try to evade the officers contributed to a finding of reasonable suspicion). Although individuals have the right to refuse to cooperate with law enforcement absent reasonable suspicion of criminal activity, the Supreme Court has held that unprovoked flight "by its very nature, is not 'going about one's business;' in fact it is just the opposite." *Wardlow*, 528 U.S. at 125. The Court has further held that "[a]lowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." *Id.* Thus, here the officers would have

had reasonable suspicion to stop defendant when he ran at their approach, even if the officers had been focused on another person as being Williams. In other words, defendant's flight alone, by itself, gave the officers reasonable suspicion that crime was afoot sufficient to chase him down to further investigate. *See United States v. Houston*, 920 F.3d 1168, 1172 (8th Cir. 2019) (finding that a person's flight when officers arrived on a scene to investigate reports of a shooting was sufficient to create reasonable suspicion to stop the person). Far from being irrelevant to the analysis of whether there was reasonable suspicion to stop defendant, his flight alone created reasonable suspicion to stop him. The Court overrules defendant's objection on this ground.

In objection seventeen, defendant argues that the R&R should not have discussed defendant struggling with law enforcement, because the struggling occurred after officers should have realized defendant was not Williams. (*Id.*). The Court agrees with defendant that the seizure occurred at the point when defendant stopped running and laid on the ground. The Court disagrees with defendant's assertion that at this point his lack of wrap-around beard should have alerted the officers of their mistake and that defendant's height was obvious to the point that the officers should have simply walked away. There is a degree to which the presence or absence of facial hair can be dispositive as when identifying a suspect. If the suspect being pursued was spotted robbing a store the day prior with a clean-shaven face, for example, it would be unreasonable for officers searching for this robber to believe a person with a full beard less than 24 hours later is their suspect. Facial hair is easily manipulated, however, so the opposite is simply not true. That is, a clean-shaven man should not expect to escape scrutiny in the search for a formerly bearded robber. It is simply unreasonable for defendant to assert that officers should have eliminated defendant from consideration due to a minor variation in grooming. Further, as discussed in greater detail below, defendant's degree of certitude when it comes to making height and weight determinations in unfounded.

Defendant ultimately overstates the degree of clarity possessed by the officers as the scene unfolded in front of them. What may seem obvious to a second-hand observer of the record after the fact was likely far less plain to the officers on the ground. The Court must consider the totality of circumstances faced by officers. Those circumstances involve the search for a fugitive who was considered armed and dangerous, among many other details already enumerated here. Before being able to definitively eliminate defendant as the suspect Williams, defendant fled. Officers Goerdt and Harridge were thus faced with the prospect of pursuing an armed and dangerous fugitive on foot. The fact that Officer Goerdt drew his duty weapon while in pursuit demonstrates the officers' level of apprehension. Defendant suggests that the appropriate course of action in this circumstance would have been for the officers to undertake a self-reflective inquiry into their own potential missteps thus far rather than secure the potential armed suspect before them. Nothing in the caselaw requires this. In the heat of the moment, the officers were fully entitled to restrain defendant and conduct a pat down for weapons to ensure their own safety before anything else. Such conduct, invasive upon defendant's Fourth Amendment rights as it may be, is fully consonant with the standard of reasonableness accepted by precedent. *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) ("[F]or the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous."); *Terry v. Ohio*, 392 U.S. 1, 28 (1968) ("The officer need not be absolutely certain that an individual is armed [to conduct a pat down]; the issue is whether a reasonably prudent man would be warranted in the belief that his safety or that of others was in danger.").

It is reasonable that officers would not have recognized defendant's height when defendant was laying on the ground in the darkness of night, rather than standing with either a point of reference or measuring tool in light. This is especially true when the scene was chaotic from the moment officers asked defendant to get on the ground,

(Harridge Body Cam. at 1:50:14), to when the officers started asking defendant to relax his hands, (*Id.* at 1:50:27). Judge Roberts' discussion of the struggle merely highlights the tense ongoing circumstance that interfered with the officers' ability to focus on the particular details that defendant points out. Defendant's stature may have been obvious to the officers had they been able to coolly assess defendant without multiple exogenous factors entering into their decision-making process. Such was not the case on the night in question, however. The Court agrees with Judge Roberts, and finds that at the point when defendant was on the ground, the officers still would have had reasonable suspicion that defendant was Williams. *See* (Doc. 36, at 21). Additionally, it is reasonable to conclude that when defendant started struggling after officers asked defendant to relax his hands, the officers' focus may have shifted to ensuring their safety rather than assessing defendant's height. For these reasons, the Court finds that the officers would have had a reasonable suspicion even after defendant was on the ground to have mistaken defendant for Williams. The Court overrules defendant's objection on this ground.

In objection eighteen, defendant objects to the R&R's reference to officers' testimony that it is more difficult to ascertain a person's height when the person is laying down. (Doc. 38, at 12-13). The Court has already addressed this concern in its response to objection seventeen. The Court overrules defendant's objection on this ground.

Objection nineteen asserts that "[i]t does not matter that the Defendant had access to Williams' girlfriend's apartment" because "the police were unreasonable in mistaking the Defendant for Williams." (*Id.*, at 13). The Court has already found that the officers had reasonable suspicion to stop defendant. That defendant had access to Williams' girlfriend's apartment was just one factor, of many, that added to the officers' reasonable suspicion that defendant could be Williams sufficient for them to approach him on the street to further investigate their suspicion. The Court overrules defendant's objection on this ground.

In objection twenty, defendant argues that the R&R was incorrect in stating that defendant's conduct is more suspicious than the suspect's conduct in *United States v. Sykes*. (*Id.*). The Court disagrees with defendant's claim that "[s]uspicion only arises if there is a probable encounter, consensual or otherwise," a claim for which defendant fails to provide any support. The Court also disagrees with defendant's assertion that unlike in *Sykes* the encounter with law enforcement in this case was not likely to occur simply from a police car driving on routine patrol in the neighborhood. *See United States v. Sykes*, 914 F.3d 615, 617-18 (8th Cir. 2019); (Doc. 38, at 13). As Judge Roberts noted, defendant entered the apartment and turned off the lights in the presence of a marked police car and returned outside after the car had left. (Doc. 36, at 25). Although there may in fact be innocuous reasons for defendant's actions, it is not unreasonable that the officers would have construed defendant's actions as efforts to evade law enforcement because of criminal conduct, which would have reinforced their suspicion that defendant was Williams, a wanted man. Defendant's conduct, although potentially innocent, was nevertheless fair game for consideration in the officers' assessment of reasonable suspicion. *United States v. Arvizu*. 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."). The Court overrules defendant's objection on this ground.

Case 2:21-cr-01034-CJW-MAR   Document 47   Filed 04/07/22   Page 25 of 26

## V.    CONCLUSION

For the reasons stated above, defendant's objection Nos. 1 and 7 are **sustained** and objections Nos. 2–6 and 8–20 are **overruled**. (Doc. 38).  The Court **adopts with minor modifications** Judge Roberts' Report and Recommendation (Doc. 36) and **denies** defendant's Motion to Suppress (Doc. 18).

**IT IS SO ORDERED** this 7th day of April, 2022.

_____
C.J. Williams
United States District Judge
Northern District of Iowa